We're here for a qualified immunity case. And while I know this court is familiar, I would like to direct your attention as we begin to the United States Supreme Court decision of Illinois v. Rodriguez, 497 U.S. 177, which is a 1990 decision. What v. Rodriguez? Illinois. Oh, Illinois, right, right. Yes. And I bring that to your attention because I think it's very important to the analysis that this court must make to the facts of this case. And what the court stated in Illinois v. Rodriguez, beginning on page 183, is that what he, the defendant, is assured by the Fourth Amendment itself, however, is not that no government search of his house will occur unless he consents, but that no such search will occur that is unreasonable. The essence of the defendant's argument in that case is, was requesting that the court impose an element that had not previously been imposed, and that is that the officer's judgment not only be responsible, but they be correct. And the United States Supreme Court said that was not the analysis that is supposed to be made. Well, let me just ask you a question because I think you're, well, first of all, whether we grant or deny qualified immunity, you still have state law causes of action pending against the officers in the district court, right? That is correct, Your Honor, but under Louisiana law, that's the same analysis that is applied to both the federal and state law claims. Well, did I see anything in your brief about the fact that the entire case would be dismissed because they were automatically entitled to immunity under state law also? I did not believe that that issue was before this court. Okay, well, it's not. Yes, Your Honor. Okay, just wanted to clarify that. Yeah, we're not addressing that. We are here on the federal claims, but that has been presented to the district court in the past, and if the federal claims are the same analysis has historically dismissed the state law claims as well, and so we are just addressing the federal law claims in the qualified immunity analysis, and I believe where the district court erred and also the error in the Appellee's argument is that they are trying to determine whether the actions of the defendant officers in this case was correct, not whether they were reasonable, and that's a distinction that has to be made. We understand that there are disputes of fact in this case. We acknowledge that, but the facts that are disputed are not material. We understand that the facts that are at issue may depend on whether the officers were in essence correct, in other words, whether Mrs. Smith actually provided consent. Where do we start in our analysis here? First of all, there are two officers, and for the moment I won't distinguish between them, but that is important, but do we start with the idea that the clearly established violation of law is that they did not request permission, or is it the clearly established issue of law that there was no implied consent? I'm sorry, Your Honor, I'm not sure I understand the second part of your question. Well, they're saying we were at the house, we took at least an entire minute, you keep citing one minute in your brief, while the officers deployed around the house, put the plaintiff five or six times, is there anyone in the house? All of this consumed an entire minute, but later on when they're talking among themselves, they say, oh my God, we didn't ask for consent, right? They admit that. Correct. They have to either say implicitly our behavior for one minute in deploying around the house is a reasonable mistake, or it is an implicit request for consent, and therefore not a violation of clearly established law, or they have to say the fact that she stood there for a minute, and whether she knew her friend was in the house or not is certainly not clear, but she stands there for a minute, she watches them go deploy around the house, put the dog at the back of the house, and have this interchange with the cops, and she never says, it's my house, don't come in. So which is the issue we have to focus on for clearly established law? Well, Your Honor, first I think I need to correct something. This occurred much, it was much longer than one minute. Well, your brief keeps saying one minute, one minute, one minute, and I did not see a record cite about that. I apologize, Your Honor. The one minute is referring to the three verbal commands that Corporal Lee gave when he was standing at the entrance of the door. Well, maybe I read it wrong, but I really, okay, I'll take, I'll see. Yes, Your Honor. You're right. Corporal Lee's testimony was that it takes approximately one minute for him to issue three verbal warnings. Well, I knew that. And so you have to look at each defendant officer individually, and so we'll take Corporal Lee. He is in the back of the house. He is called to come to the front with the K-9. He passes Corporal Barker and is told, we're good to go. Based on all of his training, all of his experience, he interprets that as consent has been obtained. That's what he believes at that moment. There's also testimony from Sergeant Vartacek where he testified if he did not believe consent had been obtained, he would not have allowed the K-9 officer to approach the door of the house and enter the home. So Corporal Lee leaves the back of the house, gets the okay from Corporal Barker, then speaks to Ms. Smith personally and says, is anyone else inside the house? She again says no, and then while she's standing in the driveway and is able to observe the front doorway, Corporal Lee with the K-9 walks to the front door over a span of approximately one minute, gives three verbal commands that a K-9 is present, they will enter. Although Ms. Smith testified that she didn't hear it, there is testimony from other officers on the street behind the house that they heard it. That disputed fact is not material, whether or not she heard it. Because now we're trying to say she, it sounds like we want to say she had some affirmative duty to say, don't go in my house. Your Honor. So now you're saying it's immaterial whether or not she heard it. You're admitting that's a disputed fact. She says she did not, they say it was loud enough that she should have. That's a disputed fact. You agree? I think it's a disputed fact on, I think the argument made by the plaintiffs is whether it was loud enough to be heard inside the house. I don't think that they dispute that it was said. I think they dispute the loudness of it. Well, she's only 15 or 20 feet away from the door and presumably Mr. Stewart inside is blocked by a wall or two. Correct. He obviously heard something because he was trying to put his shoes on, but who knows what he heard. He did. In his testimony, he did testify that he heard something because he was getting up to come to the door. I think when you watch the video, although it doesn't show those incidents, it does show a lot of conversation with Smith afterwards and the officers are having to repeat themselves multiple times. I believe it was even Corporal Lee. In hindsight, and that's what is important, in hindsight, perhaps they could have addressed it differently. Perhaps they could have done more, but that's not what the qualified immunity standard is. It's not whether they did everything correctly. It's not whether they followed everything, the best practice. That's why I was trying to focus on . . . what you're arguing, of course, is the second prong of Saussure, which was the, was it objectively reasonable and you can make an objectively reasonable mistake, but that has to occur against the backdrop of what is the, to me, what is the clearly established law. The district court did not focus on the we're good to go, right? She did not. She didn't mention it. Why is that so significant when all that means is, just for the sake of argument, Corporal Lee brought the dog. He said that was why he went to the front and he placed the dog at the front door, supposedly, and was starting to give his commands when she's standing over there and there's a whole, you know, minute transpiring. The importance of the we're good to go is because that was the signal to Corporal Lee that consent had been obtained. That's what he understood that to mean, and so the importance of that goes to the reasonableness of his belief, and he testified that based on all of their training, based on all of their experience and how they had conducted these searches, even the search across the house, across the street just minutes prior, that was what, that was what that meant. When he was told we're good to go, he had the ability to go forward and enter the home. Why did the district court overlook that fact? Your Honor, I can't speak to why the district court overlooked that fact. The district court also failed to analyze the second prong of the qualified immunity analysis, which is what you're bringing up, the clearly established prong, and I think that was also a fatal error in the court's analysis because you have to address that, and I think this court and certainly the Supreme Court over recent years has demonstrated exactly how specific and what a high hurdle the clearly established element is. In fact, it just, I believe in October of this year . . . What needed to be clearly established under these factors? In this case, I think what needed to be clearly established is that considering the totality of the circumstances, that every officer would have known they did not have authority to enter, and specifically Corporal Lee. I mean, I think what you . . . If it's clearly established, you need a warrant or you need consent. That's correct. Isn't that clearly established? That is correct. What else do we need to know before we go in that house? We need a warrant or we need consent. That's when you look at Corporal Lee's actions. He believed consent had been obtained, and that's where you . . . I think the district court and the plaintiff's argument is an error because they're looking at whether it was correct, not the reasonableness of the actions of the individual officers. Corporal Lee believed consent had been obtained. He believed . . . But you agree with me, we're past clearly established, right? You need a warrant or you need consent. That's the law that needs to be clearly established in this case. Do you agree with me on that? I do agree with that. All right. Yes, Your Honor, and I'm not . . . I find that Corporal Lee is not entitled to qualified immunity. I think based on the facts of this case, there would have to be some factually similar case on point that would establish that Corporal Lee personally had to obtain consent, not that he could rely on the information provided to him by other officers. The law does state that he's allowed to rely on the information provided to him by other officers. He is not required under the law to personally ask the homeowner if he can enter once he believes that consent has already been obtained. I think that's the clearly established element in this case. That clears Lee. I'm sorry? If we accept that, Lee is cleared. Lee gets qualified immunity. Correct. We still got somebody left, don't we? Corporal Barker. You got 90 seconds. Yes, Your Honor. It could be a little longer. Corporal Barker, and I've addressed this in my reply brief, I don't believe that that entry qualifies as an entry of constitutional significance. What Corporal Barker testified to is that at the time he entered, he was simply blocking Ms. Smith from obtaining her shoes. She testified, and she said it twice when she was asked, how did she exit the home? Was she pulled? Was she forced? Was she coerced? She testified twice, on my own, on my own. That's page 21 of her deposition. Is the contention that she was subject to an unconstitutional seizure, or is it the contention that what Barker did was an unconstitutional somehow trespass into her house? I thought it was that. I thought it was the fact that he stepped inside the threshold. I thought that was the gravamen of her complaint. I believe so, Your Honor. That's my understanding as well. But I think the word that you just used is trespass, and the law has indicated in the past that a simple trespass is not an unlawful entry that is equivalent to a constitutional violation. And in this case, Corporal Barker testified that he believed that she had already obtained consent, provided consent for them to enter. And so he was blocking the doorway, which he testified is known as the fatal funnel. And that is well known in the law enforcement circle that doorways, whether it's a car door or a door in a house, is a fatal funnel. And so he was trying to prevent that door from being closed and escort her outside based on her willingness to come outside. I do see that my time is up. I will answer any questions or defer the rest to rebuttal. Well, I would be interested in hearing on rebuttal the question about whether the dog bite was excessive force. Yes, Your Honor. Thank you. Okay, Mr. Cameron. May it please the Court, Nelson Cameron on behalf of Juanita Smith and Floyd Stewart. As you know, Mr. Stewart and the Smiths sued John Lee, Officer John Lee and Officer Derek Barker for damages under 42 U.S.C. 1983 for illegal entry into their home and for use of excessive force. This case comes before a court of interlocutory order denial of qualified immunity. This Court's jurisdiction is limited to the purely legal question of whether the defense are entitled to qualified immunity based on the facts that the district court found to be sufficiently established. In this case, we're looking at whether there was consent for the officers to enter into the home and that consent is limited here because the only way that the officers could gain entrance into that house is through a warrant or through exigent circumstances with probable cause. So we're left with a consent. The officers admit that they had no express consent. That limits us to implied consent on the behalf of the homeowner, Ms. Juanita Smith. Essentially, the defendants were wanting to turn a few no's into a yes. And what I mean by that is that Barker and the other officers simply asked Ms. Smith, do you know Christopher Collins? No. That's the first no. Is there anyone else inside your house? No. So we have two no's or perhaps a few more no's than that and that does not translate into a yes for consent. The only other way that the officers could... She seems to be standing out there like a statue for whatever period of time it took, not insignificant. What time of day was this, by the way? I believe it was just before noon. I think it was midday. Okay. So she's just standing out there and they're bringing up apparently a considerable cadre of police officers plus the dog. And she's probably maybe not unaware that they've just been across the street. I don't know whether the evidence shows that. Well, the Jarvis 1995 case for the circuit and quite a few cases after that indicate that failure to object, failure to resist cannot be translated into consent. That's the crux of it. For there to be an implicit request, it has to be some verbal statement such as I think in the Martinez case there was a verbal statement, we need to see the guns that were illegally discharged. We need to take those guns for evidence. And the officers were already inside the house at that time. The homeowner nods to the gun safe and then they actually ask, can we go into the safe? And the man doesn't respond to that. But the boy, the son, says, yeah, and I'll show you where the safe is. So I think in that case there was a finding of an implicit request. That's all verbal. Here we don't have no verbal request or statement by the officers. We need to clear the house. We need to go into the house without asking the question, but making a statement that infers the question. I will not deny there's a lot of common sense in what you're suggesting, although I wouldn't have stood there in my bare feet mute, but that's me. But what do you say about her point about Corporal Lee? Because you do have to analyze each of the defendants individually. And as to Corporal Lee, is it not correct, he was at the back of the house. At some point, Farquhar, or whatever his name was, goes to the back and says, you're good to go. And so he assumes that they have obtained consent. Yes, I would like to address that. Okay, so we have this good to go argument. First, the district court did not address that argument because it was not argued. There was no legal authority cited in the district court for that proposition. There is a case . . . You said the district court did not address it because it was not argued? That's correct. It was mentioned in facts, but it wasn't argued that this is evidence of consent. There was no legal authority cited. I don't believe there was any legal authority cited for that proposition until we get to the reply brief of the defendants in this court. I think in my main . . . It was in their main brief in this court, but it's not a question whether it goes strictly to consent to me. It goes to whether he could have made a reasonable mistake. Yes, well, I'd like to address that. I'll address the substance of it as well, but I wanted to bring it to the court's attention. I don't believe there was a waiver. The first thing we look at is that Barker is the individual who allegedly told Lee, you're good to go. Well, Barker says he never got consent from Ms. Smith, never got it. So the reasonable inference is Barker never told Lee, you're good to go, because he didn't have that information to give to Lee in the first place. Well, does Barker say he said . . . Well, see, that's my next point. Barker does not collaborate that he said to Lee, good to go. He was never asked that question. Did you ever tell Lee that he was good to go? I don't know if it was because of the sequence of the depositions that we didn't ask that question of him, but even in the motion for summary judgment, Barker's affidavit does not indicate in it that he told Lee, you're good to go. So it's not collaborating. So I believe if you take all reasonable inferences in favor of the plaintiff, there's a question here as to whether the statement was ever made in the first place. Well, I don't think you . . . I mean, it's sworn testimony by Corporal Lee, right? Whether it's corroborated or not isn't material. If it's sworn testimony by Corporal Lee, that's what it is. Well, I think it's a reasonable inference. If it's not corroborated by the person who was supposed to have spoken the word, I always think there would be an inference there that wasn't said. The next thing we'll look at is the phrase, good to go. A professional police officer does not tell another officer something as vague as some street phrase like, you're good to go. What in the world does that mean? Does that mean that you can take the canine and do your job at the front door? Which includes, because you're supposed to take functional authority over a scene, which includes asking for consent. It includes giving the warning. Well, you'd have had to get more evidence in the record, it seems to me, about their procedures in order to draw that series of inferences at all. In other words, what you know is, what we know from the record is that Lee has the dog. Lee's at the back of the house. Lee comes to the front. Lee swears that they had consent in the previous house across the street, and Barker says, good to go, which I don't regard as ambiguous here. Well, think about this, is that Lee must have thought it was ambiguous because when he went to the front, he asked Ms. Smith again, is there anybody inside? Why would you be asking those questions if you already had assurances that everything was good to go? Because he wasn't so sure it was all good to go, that's why. You know, he wants to know whether there's a kid inside, whether there's somebody decent, you know, whether the defendant is . . . I mean the cop or whatever his name is. That's certainly true, Your Honor. I don't see that as . . . He would also want to know does he have consent to go inside. Do Lee and Barker work for the same department? I'm sorry? Lee and Barker work for the same department, office? Yes, same department. That's correct. I think Barker was a sergeant and John Lee was corporal, I believe. So it shouldn't be a problem for them then if one says he said this to me to have the other one corroborate it if he can. I just don't know why we're debating, we're talking about it and the best person to corroborate it would be the guy who said it, but somehow he's never been asked to verify whether or not he said it. Is that what you're telling me? Nobody ever asked him? Right. Or he was asking and he said I didn't say it. I didn't have the opportunity, I believe, to ask him whether it was corroborated. All right. Now as far as Barker's entry, the Supreme Court has said that even the slightest physical invasion of the structure of a home is too much, even by a fraction of an inch. And the Supreme Court even said that there's no exemption even for the officer who cracks the front door  So any entry into the house is illegal and not a proper search. Any trespass is automatically an illegal search or seizure. Well, this is what he did by entering the house. Well, all he did was step inside the threshold so she couldn't get back in. He blocked Ms. Smith from going inside her house. Right. And then he used a command under federal law for her to leave the house. So his entry into the house resulted in the removal of a citizen. The police do not have the authority to go in and extract people from their own homes unless they've got consent, a warrant, or exigent circumstances. None of those existed here. I mean, I'm sorry I didn't go back and look at the precise cases you're talking about, but just theoretically, it sounds more like a seizure of Ms. Smith to me than a search or seizure of the house. What you're describing is he is seizing her by telling her, you can't do this. Arguably. He is not seizing her house, is he? That's your theory? I'm not sure I followed all that. I'm having a little difficulty hearing it. I believe he did enter the house. I don't know if he conducted a search while looking inside the house. I would imagine he did. If they're looking for someone, I'm sure he's looking inside.  He is depriving her of the use of her house and then telling and removing her from her home. The Fourth Amendment prohibits unreasonable searches and seizures, and that is a type of seizure is to remove someone, order them to leave their home. So the entry would be a clearly established law that prohibits that entry that Barker performed. I hope you're going to talk about the deployment of the— Yeah, I was about to do that, Your Honor. I'll do that. So the second part of the case is the use of excessive force by the use of the canine. The law is clearly established that the use of a canine is prohibited or is unconstitutional if, one, the duration of that biting is a minute to two minutes. That's Cooper v. Brown, and there's also some other cases on point out of the circuit. The duration can be objectively unreasonable. The use of the dog in this case was a bite-and-hold type of dog, canine, excuse me, that goes into a structure, a home, and looks for potential people who may be inside the home, and the first person that that canine encounters, if it does encounter a person, will bite that person. In this case, Lee entered the home. Of course, if he's not in the home with consent or justifiably any use of force after that, it would be unconstitutional. It would be a violation of Mr. Stewart's rights. Mr. Stewart, a 76-year-old man, taking a nap in the back bedroom, watching Westerns on TV— But it wasn't Mr. Stewart's house, right? I'm sorry? No, it was not Mr. Stewart's house. He had been living there for five years. That's when he dismissed an affidavit, and he had keys to the house. He was free to come and go as he pleased. So he had a right, a protected privacy right, in that home. That's U.S. v. Bacon. It talks about even overnight guests have a privacy protection. Let's assume he had a reasonable expectation of privacy in the home, which is what I think you're saying. But I guess I'm concerned about what you said with regard to the process. So you said that when this bite-and-hold dog enters the home, the dog bites and holds the first person the dog sees, right? S-E-E-S. Well, right. So it's what you're telling me, that the procedure doesn't contemplate that the dog, upon entry, gets a command to seize somebody. You're saying it doesn't contemplate that. The dog grabs the first person the dog sees. That's correct. That's correct. And that's the procedure. Well, that's plain if we contend here that that is objectively unreasonable because unless that dog— No, I'm not asking about this case specifically. I'm asking you whether or not the procedure, when an officer— Yes. Because I don't know, as this bite-and-hold dog. Yes. The procedure is that the dog goes in, and the first person seen by the dog, the dog is supposed to bite-and-hold that person. So the officer is not required to give a separate command for the dog to grab that person. That is my understanding, and I believe that's what Officer Lee testified to in the brief. And that's what makes this unreasonable because Officer Lee, in a long lease on the dog, allows the dog, when he's in the living room, allows the dog to go down this hallway out of sight, out of sight of Officer Lee, and that's where he encounters Mr. Stewart. So this command is made without knowledge of the officer knowing whether the person that's going to be bit is resisting or is a threat to anyone or there's any justification for any force at all, this particular person. At some point, Mr. Stewart objected. Is that right? Objected to the coming incident? No, he objected to the coming— I don't think he had the opportunity one way or the other to object. I mean, he was— Well, he said he did. I'm sorry? He yelled out, and the cop released the dog within three seconds. Oh, get your dog off of me. He did say that. Yeah. Yes, yes. Of course, he objected to the use of the dog on him, yes. I thought you were referring to the entry, the initial entry. So it was only three seconds after he objected. At the time between when he objected and—objected that he was innocent or that he wasn't doing anything wrong and when the officer released the dog was, in Stewart's words, about three seconds. That's way less than the one to two minutes that you described earlier. No, he told the officer, get your dog off of me. He said that at least four times. The dog was steadily biting me, if I remember his testimony. The dog is steadily biting me, and the man, the officer, is just standing there. That's what I recall his testimony being, something along that line. I mean, I can't say it word for word. But the testimony— I don't know where the three seconds comes in from. Well, it's record page 699. Stewart stated that the time gap between when he objected and when the officer released the dog was, quote, about three seconds. That's not really going to be a constitutional violation. The way you're putting it, you're right. I don't think it would be. But that's not the testimony of Mr. Stewart. Mr. Stewart is—if you look at all his testimony and you take it all together, he says four times to the officer, get your dog off of me. He says also, while that dog is steadily biting on me, the officer is there doing nothing. Well— I would imagine. I don't know where the three seconds come in. That was on the previous page that that occurred. And the testimony from Mr. Stewart that I was quoting was after Mr. Stewart, presumably for the first time, raised an objection, whether he said, you've got the wrong person, or I haven't done anything, or I'm not who you're looking for. Whatever he said, then the dog was released within three seconds. It could be that it took that amount of time. The dog would not respond to verbal commands. Verbal commands were given. The dog would not respond. The officer had to do a choke hold, pull him on. So once—perhaps what is being meant there is once the officer laid hands on the dog, it took him three seconds to get the dog off. Yes, sir. Maybe that's what they're referring to. Yes, sir. Let me just say—let me give one more thought here with you, Judge Smith, is that immediately when the officer entered the bedroom, he knew this was not the man he was looking for because Mr. Stewart is about 76 years old and Mr. Combs, who they were searching for, was a 33-year-old. He knew that immediately that this was not the man. So immediately, the officer had an obligation to get the dog off, and he did not, but for about a minute. Any other questions? Thank you. You're not—tell us once more precisely what your claim is as to—I know part of your claim as to Officer Lee is that he entered the house unlawfully, and therefore, the apprehension with the dog bite is also illegal. Yes. That's part of it. Yes. Is there any other aspect of that claim? Well, he did enter the home. Not only with the dog, but he himself and, I believe, Corporal Travis—well, we don't have Corporal Travis as a defendant, but Lee went into the home, went into the kitchen. He searched the house. That's another aspect of it. Did you make a contention that standing alone, the circumstances of the dog bite constituted excessive force? I'm sorry. Could you repeat that? Do you make the specific contention that Corporal Lee's either the procedure with the dog or the use of the dog in this circumstance were independently excessive force? Would you go to— If I'm following you here, I think what we do contend is that the use of the canine in the manner it was used was objectively unreasonable because Lee lost sight of the dog and lost control of the dog. So that would have to go to a jury? Yes, Your Honor. Did—whether or not the jury found—that's your contention—whether or not the jury found that he was reasonably mistaken in thinking that he could go into the house? Yes, Your Honor. That's correct. All right. Well, we'll just have to—thank you. We'll look at it. Okay, Ms. Buckle. Yes, Your Honor. I want to clear up a couple of things. First, I don't believe there's any testimony in the record that Corporal Lee sat there and did nothing while the dog was biting. I think the testimony in the record is very clear that immediately upon Corporal Lee recognizing that Mr. Stewart was not the murder suspect that they were looking for, that he both gave commands and simultaneously grabbed the dog to pull him off. Well, I'm not sure that's true. Mr. Stewart, in his deposition—this is from Record 698—alleges that the officer Lee, quote, didn't release the dog and then he left that dog steadily biting me. That was the testimony in his deposition. Your Honor, I mean, I think when you read them together, the dog may have still been biting him, but Corporal Lee was still actively trying to pull the dog off. Corporal Travis also testified to that, that it was an immediate reaction. In October, in Henderson v. Harris County, this court, again, emphasized that there are two paths in order to satisfy the clearly established prong of the qualified immunity analysis. One, there must be an on-point case. Two, there must be an obvious case exception. I don't believe this is an obvious case exception, so that means there must be an on-point case. And this court and the United States Supreme Court have said that in order for it to be clearly established, there must be existing precedent which squarely governs the specific facts at issue. It must be beyond debate, not merely suggested by the existing precedent. So, Professor Brown, which I wrote, you're well familiar with it. Yes. It was a violation of clearly established law, quote, to permit a dog to continue biting a compliant and non-threatening arrestee. Your Honor, there's no evidence. We have, there was testimony, I'm sorry, there was argument a minute ago that there's case law that says duration of one to two minutes would be unconstitutional. There's no evidence that this was one to two minutes. I mean, there's just no evidence to support that. That's an argument. That's speculative. There's no evidence to support that. There's no case law prohibiting a bite and hold procedure that was used by Corporal Lee, and that's how the K-9 and Corporal Lee were trained in this case. I think technically in Cooper wasn't the point that the arrestee had already been handcuffed, so the point at which the seizure became unconstitutional was after he was handcuffed, right? That would be correct, Your Honor. Here you have presumably a quick effort to apprehend somebody who's not an arrestee at all. You're, you know, they think they're going to apprehend a person under indictment. Correct. They were told that there was no one in the house. So even though Corporal Lee recognized that Mr. Stewart was not the murder suspect, this was someone that they had been told was not in the house. He had not— That sounds like you're suggesting that they should have just—so they should have believed her and not—what are you saying? They were told that no one was in the house. Obviously, they didn't believe her because they went in. So they suspected that somebody might be in there. They went in. Correct. Your Honor, my only point was to distinguish— So you're saying they were surprised that they actually ran into somebody because she said nobody was in the house? Well, I think once he realized it was not the—I think they suspected that possibly Christian Holmes was in the house. Correct. I think when he saw that it was not Christian Holmes— Yet he lets the dog run loose in the house. I'm sorry? Does he let the dog run loose? No, the dog is on the leash the whole time. The dog didn't get ahead of him like they claimed? I mean, I know the dog's out in front of him. He says the dog—they lost sight of the dog at some point. It's a long leash. It was a long leash, and Corporal Lee testified that he first allowed the dog to go through, but as he was coming back, he reeled the leash back in. So at the time he went around the corner and actually bit Mr. Stewart, the dog was not extended on the leash. Corporal Lee had reeled the leash back in, and it was—I don't know the exact length, but it was not the full 20-foot length of the leash. I see that my time is up. I do want to again point out that I think the clearly established prong is essential for all of the claims asserted. The plaintiff did not allege in their complaint an unlawful seizure of Ms. Smith. The claim that they asserted in this case was an unlawful entry in search of the home. I think when you look at all of the facts and when you consider whether there's any clearly established law, that both Corporal Barker and Corporal Lee are entitled to qualified immunity on the claim of unlawful entry, and that Corporal Lee is also entitled to qualified immunity for the excessive force claim. And so we do ask that the district court's rulings on those issues be reversed. Thank you. Okay. Thank you very much.